# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 15-cr-23-RGA |
| | ) | |
| DAVID R. GIBSON, | ) | |
| ROBERT V. A. HARRA, | ) | |
| WILLIAM B. NORTH, and | ) | |
| KEVYN N. RAKOWSKI, | ) | |
| | ) | |
| Defendants. | ) | |

---

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT KEVYN RAKOWSKI

---

Bartholomew J. Dalton (ID No. 808)
Andrew C. Dalton (ID No. 5878)
DALTON & ASSOCIATES, P.A.
Cool Spring Meeting House
1106 West 10th Street
Wilmington, Delaware 19806
(302) 652-2050
bdalton@bdaltonlaw.com
adalton@bdaltonlaw.com

Henry E. Klingeman, Esq.
Helen A. Nau, Esq.
KROVATIN KLINGEMAN LLC
60 Park Place, Suite 1100
Newark, NJ 07102
(973) 424-9777
hklingeman@krovatin.com
hnau@krovatin.com

*Attorneys for Defendant Kevyn Rakowski*

## PRELIMINARY STATEMENT

Defendant Kevyn Rakowski will appear before Your Honor for sentencing on December 19, 2018. At the sentencing, Ms. Rakowski will ask the Court to consider the factors listed in 18 U.S.C. § 3553 (a), and then impose a sentence of probation. Ms. Rakowski respectfully submits this Memorandum to assist the Court in its exercise of discretion.

The Court's mandate is to impose the minimum sentence sufficient to serve the purposes of sentencing. 18 U.S.C. § 3553(a); e.g., Kimbrough v. United States, 128 S. Ct. 558, 570 (2007). Thus, the correct sentence is the lowest one that will punish, deter, and rehabilitate in the manner that the Sentencing Reform Act requires. See 18 U.S.C. § 3553(a)(2).

For the reasons explained below, Ms. Rakowski respectfully submits that a sentence of probation, with or without conditions, will serve every statutory purpose. Because a Guidelines sentence would be greater than necessary to serve those purposes, the Court should vary downward and impose a term of probation. Kevyn Rakowski was a devoted wife -- very recently widowed by the sudden passing of her beloved husband Peter Rakowski. Kevyn is a 65-year old mother of two successful adult daughters. She is adored by her family, friends, and members of her community, some of whom have felt moved to write to Your Honor and describe the type of person Kevyn truly is.

Kevyn suffers from several health issues that follow many of us into our sixth decade. She has osteoarthritis, high blood pressure, TMJ and a shoulder that needs surgery. Kevyn also has some uncommon health challenges due to her donating a kidney to Peter in 2001. The medical implication of her donation, or her other ailments, are not in-and-of themselves reasons for leniency. The fact that she gave her husband a kidney, however, does speak to the person she is. Recently, Kevyn has suffered from heart palpitations and chest pain requiring a full cardiac

workup. According to her cardiologist, with whom counsel has consulted, this is a direct result of her near-constant anxiety and depression.

The nature and circumstances of this offense, and Kevyn's life and career, warrant leniency. Kevyn's life reflects her character as a hardworking woman of integrity. Kevyn is no longer employed and she is retired from accounting. Therefore, she is incapable of reoffending. Respectfully, the Court should consider the isolated nature of the alleged offense conduct in the context of a long and honorable life.

Kevyn has been on pretrial release since June of 2015 and has been fully compliant with all terms and conditions imposed by the Court. Sentencing Kevyn Rakowski - a 65-year-old widow and mother with no criminal history – to probation under the circumstances set forth herein, would be sufficient but not greater than necessary to accomplish the goals of sentencing.

## I.     SENTENCING PROCEDURE

Sentencing courts must "consider the widest possible breadth of information about a defendant" to ensure individualized sentencing.  Pepper v. United States, 562 U.S. 476, 131 S. Ct. 1229, 179 L. Ed.2d 196 (2011).  Following Third Circuit case law, the sentencing court should conduct a three step inquiry when imposing a sentence: (1) calculation of the Guidelines range, (2) ruling on any motions for departures, and (3) determination of the § 3553(a) factors. United States v. Merced, 603 F.3d 203, 215 (3d Cir. 2010); e.g., United States v. Arrelucea-Zamudio, 581 F.3d 142, 146 (3d Cir. 2009). While a sentencing court must take the Guidelines into account, it may not presume that the Guidelines are reasonable, but must give careful attention to the factors contained in § 3553(a).  Gall v. United States, 552 U.S. 38, 50 (2007); Nelson v. United States, 555 U.S. 350, 352 (2009).

As noted above, the Court's statutory mandate is to impose the lowest sentence that serves the purposes of sentencing – not to choose among multiple "reasonable" sentences.  18 U.S.C. § 3553(a) ("parsimony provision"); e.g., Rita v. United States, 551 U.S. 338, 354 (2007).

Moreover, a sentencing court may not treat a Guidelines sentence as inherently superior to a non-Guidelines sentence.  See, e.g., Nelson v. United States, 555 U.S. 350, 351 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are not to be *presumed* reasonable.") (emphasis in original); Gall v. United States, 552 U.S. 38, 50 (2007).  The Court may even vary from the Guidelines range simply because it disagrees with it on policy grounds. Spears v. United States, 555 U.S. 261, 264 (2009).

1.      **GUIDELINES CALCULATION**

In this case, Ms. Rakowski and the Government agree that the correct guidelines range is level 29. Accordingly, Ms. Rakowski raises no contested Guidelines issues.

The final revised Presentence Investigation Report dated November 9, 2018 (the "PSR"), provides that the November 1, 2016 edition of the United States Sentencing Guidelines Manual applies in this case. Ms. Rakowski is in Criminal History Category I (0 points). At a level 29, the advisory Guidelines range is 87 months to 108 months.

After United States v. Booker, 543 U.S. 220 (2005), the Guidelines are merely advisory, and the Court has the discretion to fashion any sentence that satisfies the Sentencing Reform Act, 18 U.S.C. § 3553(a). Here, the applicable Guidelines range would result in punishment greater than necessary to serve the purposes of sentencing and sentencing within it would violate the Sentencing Reform Act. Respectfully, Ms. Rakowski should be sentenced to probation based on the 3553(a) factors.

2.      **DEPARTURE MOTIONS**

Pursuant to a stipulation with the Government, dated October 5, 2018, the parties have agreed not to file departure motions with respect to the PSR computation in advance of sentencing. (See D.I. 843).

As set forth below, Ms. Rakowski respectfully requests that the Court evaluate the § 3553(a) factors in support of a significant variance.

**3.     THIS COURT SHOULD IMPOSE THE MINIMUM SENTENCE
REQUIRED BY LAW, EXERCISING THE DISCRETION
RECOGNIZED BY THE SUPREME COURT IN *GALL V. UNITED
STATES* and 18 U.S.C. § 3553 (a).**

It is incumbent on this Court to "consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify,

the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 51(2007) (quoting

Koon v. United States, 518 U.S. 81, 113 (1996)).

Pursuant to 18 U.S.C. § 3553(a) and United States v. Booker, 543 U.S. 220 (2005), this

Court must impose a sentence "sufficient, but not greater than necessary," to achieve the

objectives of sentencing, specifically with regard to the factors set forth at § 3553(a).  This

obligation, known as the "parsimony clause," applies at every federal sentencing "except as

otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony

clause defines the Court's "overarching duty." Pepper v. United States, 131 S.Ct. 1229, 1243

(2011).

The Supreme Court of the United States has, since United States v. Booker, consistently

underscored the "advisory," non-mandatory nature of the Guidelines as applied by the bare

reading in the presentence report.  It is a well-settled Third Circuit standard that a sentencing

court "must calculate a Defendant's guideline range, but may only use that range as a starting

point for determining *a reasonable sentence* based on an individualized assessment of the factors

set forth at 18 U.S.C. §3553(a), in order to arrive at a sentence that is s*ufficient* but not greater

than necessary." United States v. Dillon, 572 F.3d 146, 148 (3d Cir. 2009) (emphases added).

These factors, in pertinent part, are below:

> (1) The nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a).

The law of this Court and the §3552(a) factors require a deeper look into not just the person to be sentenced, but the reasonableness of the range itself as applied to her. See United States v. Merced, 603 F. 3d 203, 215 (3d Cir. 2010) (discussing the "three step inquiry when imposing a sentence).

Kevyn Rakowski urges this Court to apply these factors in order to impose a sentence of probation.

### i) The nature and circumstances of the offense and the history and characteristics of the defendant [§ 3553(a)(1)]

The offenses Ms. Rakowski has been convicted of do not represent a true depiction of her character. Ms. Rakowski's devotion to her family, friends and her community is precisely the type of information that the Court must consider in determining her sentence under 18 U.S.C. § 3353(a)(1). In addition, the Court should consider Ms. Rakowski's age and physical health.

The Court should also consider the nature and circumstance of the offense. Courts have recognized that the advisory guideline range in fraud cases is often a poor approximation of a "just punishment." *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after* Booker, 20 Fed. Sent'g Rep. 167 (Feb. 2008) ("The sentences nominally prescribed by the Guidelines for high-loss corporate fraud cases have become so draconian that judges are unwilling to impose them even in the biggest and most publicly notorious cases."). Given the

extreme punishment called for by the Guidelines calculation in this case,  along with Ms. Rakowski's relatively passive role, and the isolated nature of the alleged conduct in the context of her long and honorable life, we respectfully request that the Court vary substantially for Ms. Rakowski.[1]

HISTORY AND CHARACTERISTICS OF KEVYN:

Kevyn Rakowski is a 65-year-old woman, who has lived her entire life as an upstanding and law-abiding citizen until she was found guilty in this matter.  She is deeply loved and respected by her family and friends.  Ms. Rakowski recently became a widow, when on September 7, 2018, following her conviction, her devoted husband tragically passed away after a fall in his home, paces from Kevyn, as she sat in their kitchen.  Peter had a syncopal event while at home due to his underlying cardiac problems exacerbated by stress. That event caused him to fall backwards unabated.  His head struck the ground, which caused a subdural hematoma and rapidly increasing intracranial pressure that was unable to be arrested. Kevyn and her family have been left devastated by the loss of Peter, Kevyn's primary source of emotional support.

---

[1] See USSG, § 2B1.1, 18 U.S.C.A. Commentary 20 (C) Downward Departure Consideration: There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted. For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted. See also United States v. Free, 2015 WL 8784738, at *7 (W.D. Pa. Dec. 15, 2015) ("the universe of facts relevant to calculating a particular Defendant's "Guidelines" sentence does not, itself, define a Defendant's proper sentence in a given case; instead, these facts, *considered through the lenses of the § 3553(a) factors,* can properly push a particular sentence up or down, away from the calculated Guideline range.") (emphases added).

Kevyn and Peter raised two devoted adult daughters: Kim and Jennifer. It is clear that the relationships fostered by Kevyn are treasured by her daughters, as well as her siblings, and friends. As attested to by her family and friends, Kevyn is "a diligent hardworking, loving, kind, faithful mother, wife, family member, and friend." (A-7).

Kevyn's Early Life: Kevyn's upbringing informs one of who she is as a person. Kevyn grew up in a military family, led by her father, William J. Kilpatrick, Jr a Class of '43 West Point Cadet, who rose to the rank of Colonel in the U.S. Army Air Force. (A-2; A-6). William Kilpatrick was the President of the West Point Honor Council his last year at the USMA in 1943. (A-5). Mr. Kilpatrick and his class members graduated early in order to enter World War II. After graduation, William Kilpatrick became a bomber pilot. During the war, Mr. Kilpatrick's plane was shot down over Europe and he was captured. He was eventually freed as part of a prisoner exchange. Among other honors, Kevyn's father William Kilpatrick received the Distinguished Flying Cross and Bronze Star. (A-2).

Growing up as part of a military family, Kevyn endured many difficult moves due to her father's frequent deployment to different Air Force and NATO installations. Kevyn was born in Montgomery, Alabama; and was subsequently raised all over. She called Topeka, Kansas; Guam; Elsworth, South Dakota; Lubbock, Texas; Izmir, Turkey; and Big Spring, Texas, "home" during her formative years. She attended three different high schools. (A-2). Kevyn was raised in a setting influenced by military values, where discipline and honesty, integrity, and character-building traits were developed, valued, and exemplified. (A-2). Kevyn's brother describes their late parents as "sticklers for excellence," and states that the siblings "were always driven to excel." (A-5). Kevyn's father William, "was especially adamant about virtue, integrity, and

accountability." (A-5). Kevyn and her brothers were taught to "strive to never blame anyone else for anything," and to "strive to take responsibility and to be sincere and authentic." (A-5).

A Devoted Wife: Kevyn met Peter Rakowski, an Air Force instructor pilot, when she was 18 years old and attending Howard County Junior College in Texas. Kevyn married Peter at the Williams Air Force Base chapel, in Chandler, Arizona, on March 22, 1973, while Peter was serving in the U.S. Air Force. (A-2). Peter, Kevyn's husband for over 45 years, drafted a letter to Your Honor (dated August 20, 2018) approximately two weeks before he passed away. Peter poignantly and lovingly described Kevyn. Peter indicated that throughout her life Kevyn has been guided by her faith, her love and duty to country, her support and guidance to their families, and her workplace commitments. (A-2).

As a wife and mother, Kevyn's capacity for sacrifice and dedication has been limitless. During their life together, Peter had a series of health problems that he could not overcome had Kevyn not been there for him. (A-4). In 1986, Peter was diagnosed with an incurable polycystic kidney condition and his career was in jeopardy. Kevyn went back to school in 1988 while she continued to care for their daughters so that she would be able to support the family if necessary. (A-2). Kevyn commuted at least 60 miles to Tulsa University and eventually graduated Magna cum Laude with a Bachelor's degree in accounting in 1991, at age 38. (A-2). Kevyn's sister-in-law Donna observed that Kevyn's "academic achievements were excellent and true to her style and personality working diligently to give it her best." (A-7).

Kevyn began her career with Arthur Andersen in Tulsa. In 1998, Kevyn transferred to the Philadelphia office of Arthur Andersen, when the Rakowskis decided to move close to Peter's home town in south New Jersey for Peter's employment, and to be near a high quality kidney transplant hospital. (A-2). On September 5, 2001, Kevyn exhibited her extraordinary character

when she and Peter entered Jefferson Hospital where she donated one of her kidneys to her husband. (A-2). Kevyn provided the sole financial support for the household while Peter recovered and sought new work over the next 13 months. (A-2).

Peter recounted his many medical challenges, and stated that he can deal with the issues that God has put before him.  (A-2). Peter expressed that his anxiety level was heightened by his knowledge that Kevyn was worried about how any time away from him would have a harmful impact on his medical prognosis.  (A-2).

A Supportive Mother:  Kevyn and Peter raised two successful and productive daughters: Jennifer, a customer liaison for a medical device implant manufacturing company in ███████████ and Kim, an environmental microbiologist and research lab manager at ████████ ██████████████████████████.

As a mother Kevyn is dedicated and caring.  Her daughter Kim states: "[f]rom an early age my mother was always there to reassure me…" and "I don't think it's possible for a daughter to feel more loved or closer to her mother than the relationship I have with her. A piece of her is always with me." (A-3). Her longtime friend describes Kevyn's role as "a devoted, no nonsense mother.  Her advice was always loving, supportive and practical to her girls, and eventually to their husbands.  She continues to be very close to both of them." (A-8).

Kevyn has had a positive influence on and is a role model to her daughters.  Kim states: "I understood why she went back to school, which was unpopular for a woman of her age to do at the time in the late 80s in Oklahoma. She became an inspiration to me professionally." (A-3). "[M]y mother has always served as inspiration for me as the woman I have become. The principles of integrity instilled in our family has greatly contributed to my profession as a researcher in molecular biology at the ███████████████. My parents taught me to be

diligent, honest, and hard working." (A-3). Her daughter Jennifer states: "[p]utting in the effort to complete a job and do it right is always at the forefront of my mother's mind. This applies to all aspects of her life, whether it pertains to work or her hobbies." (A-4).

A Caring Sister:  As a sibling, her brother describes his relationship with Kevyn as always having "great affection and love for each other."  He further states: "I feel I know her as well as a brother could" and that "I stand by my sister, whom I know to be a loving, caring person of the highest integrity." (A-5). Her brother Tim states that "Kevyn has always shown a real sense of honor and duty in everything that she does."  (A-6). He further states: "[a]s always, I continue to believe and trust in my sister and will provide whatever help I can.  My sister, Kevyn has never given me any reason to feel any other way about her."  (A-6).

A Loyal Friend and Co-worker:  Kevyn has always been a loyal and trustworthy friend. A friend states that Kevyn "is a gentle, kind person who always treats others with respect." (A-9). She believes in Kevyn and trusts her "because of all the good qualities she represents." (A-9). Another longtime and close friend, who is a former co-worker of Kevyn's states that she has "complete trust and admiration" in Kevyn, who was there for her as important support in a time of great grief.  (A-8). She describes Kevyn's instinct and compassion as unique during a dark time.  (A-8).

Kevyn is also respected and admired in her professional capacity. As a co-worker and close friend states: "Kevyn was an excellent manager of people, demanding good and timely work from members of her team, but also was encouraging and supportive.  She collected and groomed women and men of talent.  She encouraged the best to stretch their skills and was highly admired by the people who worked for her." (A-8).   Her sister- in-law states that:

"Kevyn's work ethic is impeccable and she gave her all in every corporation she worked for without question." (A-7).

Kevyn's former boss and the CFO at Marlin Business Services describes Kevyn as "an exceptional professional" and someone who "demonstrated the highest levels of integrity and work ethic." (A-10). He further states that Kevyn "was well respected within the organization both by her superiors and subordinates," adds that "it was a pleasure to work with Kevyn and I would hire her again today if given the opportunity." (A-10).

Indeed, this same sentiment was expressed by Mitch Slijepcevic, former Assistant Controller at Wilmington Trust, a Government witness, who praised his former boss Kevyn not only as an accountant, but as a person of the high integrity. (3778–3785). As a boss, Kevyn was courteous and she gave her staff of many direct and indirect reports, the leeway and authority to do what they thought was right. (3779:19-3781:4).

<u>Charity at Home</u>: Kevyn has always helped those around her financially, spiritually and emotionally. Kevyn's brother describes her as "a kind and caring person." (A-5). Kevyn's "charity and humanitarianism know no bounds." (A-4).

There are numerous examples of Kevyn's compassion towards others. When her one brother was homeless, without a job, and ███████████████ Kevyn and her husband Peter let him live with them for a couple of years until he got back on his feet. (A-4); (A-5); (A-7). As devoted daughter, when her father had a significant surgery for a WWII incurred health issue, Kevyn welcomed him into her family home and helped her mother care for him, while maintaining a household and caring for her husband and daughters. (A-2).

In October, 1984, Kevyn learned that her mother had died in an auto accident. After the funeral her father again came to live with Kevyn's family until he could recover from the shock

and decide on his future. Kevyn was there to provide emotional support for her father, while she grieved the loss of her mother. (A-2).

As a caring daughter-in-law, Kevyn's mother-in-law lived with Kevyn and Peter during the last four years of her life. When her cancer returned and she did not want to be in a hospital, Kevyn and Peter cared for her at home, and Kevyn nursed her mother-in-law in her final days. (A-2) (A-4); (A-7).

When Kevyn's brother-in-law and his wife sold their home and belongings to serve as church missionaries in Thailand, Kevyn and Peter assisted with monthly financial support for their outreach activities for years. (A-2). Kevyn has lived up to her sister-in-law's description of Kevyn as "a generous and giving woman reaching out to others." (A-7).

<u>Charity Outside the Home</u>:   Kevyn's generosity and support towards those in need extends beyond her family and friends. Kevyn has been active in her community and always donates to their local church and charities.  (A-1); (A-4); (A-7). Kevyn is "deeply involved with the Episcopalian church," through participation and service.  (A-3). For example, Kevyn and Peter helped with various fund raising activities for the youth group.  Through their church, Kevyn and Peter helped host a family fleeing the Soviet Union because of religious persecution. (A-2); (A-3). Her daughter states that: "[m]y parents' involvement taught my sister and me to value the small things we took for granted. It was an early lesson into the lives of oppressed people." (A-3). Kevyn "never waivers to help someone when they see a person is struggling or in need" (A-4). In addition, Kevyn and Peter have supported the United Way, as well as the American Red Cross through disaster relief funds, and the local food bank in Florida. (A-1).

Ms. Rakowski respectfully requests that the Court consider her charitable deeds and grant her a significant variance.  See <u>e.g.</u> <u>United States v. Tomko</u>, 562 F.3d 558, 571 (3d Cir. 2009).

Kevyn's Health:  In considering the characteristics of Ms. Rakowski, we respectfully request that the Court consider that Ms. Rakowski suffers from several medical conditions, which would make incarnation more difficult on her than the average person.  In 2001, Kevyn donated a kidney to her husband Peter.  The health of Kevyn's single kidney must be monitored every six months.

Ms. Rakowski also suffers from variety of health conditions, including osteoarthritis aggravated by stress and high blood pressure, for which she undergoes specialized treatment and medications.  Kevyn has been pre-diabetic from 2014 – 2017, and must be continuously monitored every six months.  Ms. Rakowski recently required a heart catheterization due to heart palpitations and shortness of breath.  Ms. Rakowski continues to experience heart palpitations and chest pain, and she was recently placed on new medication.  According to her cardiologist, this is a direct result of anxiety and depression.

Ms. Rakowski recently had an endoscopy performed, during which a biopsy was performed and revealed H Pylori, which is a bacterial infection that can cause ulcers and cancer if treatment is not effective.  Ms. Rakowski will also require surgery (scheduled for January 7, 2019) for a bone spur in her left shoulder (diagnosed in February of 2018) as the scheduled surgery was delayed due to her heart problems.

Kevyn suffers from almost constant anxiety and depression, which she has discussed with her primary care physician, who offered to put her on medication.  She has declined due to possible side effects.  Kevyn's late husband Peter expressed his serious concerns for Kevyn's health and mental welfare should she be taken away from the care she is currently receiving in Florida. (A-2). Ms. Rakowski respectfully requests that the Court consider Kevyn's need for continued treatment and reduced risk of recidivism due to her health issues. See e.g.  United

14

States v. Thompson, 553 F. App'x 181, 187 (3d Cir. 2014) (significant downward variance based in part on poor physical health); see e.g. United States v. Baynor, 335 F. App'x 163, 168 (3d Cir. 2009) (Court exercised discretion to grant a variance from the Guidelines sentence in light of defendant's serious medical health issues).

Impact on Kevyn and her Family:  Kevyn and her family have been, and continue to deal with the consequences of this matter on a daily basis. The length and the uncertainty of the legal process has taken its toll on Kevyn and her family, emotionally and physically.  Kevyn suffers from almost constant anxiety and depression.  ████████████████████████ ███████████████████████████████████████. (A-1); (A-2); (A-3); (A-4). Kevyn's travel has been restricted since 2015 when she was required to surrender her passport, and she has been unable to visit her daughter and son-in-law ████████████ ████████  (A-2).

Tragically, the heightened level of stress related to the trial and Kevyn's conviction, contributed to Kevyn's husband Peter's death on September 7, 2018.  Kevyn and her family are devastated and left grieving the loss of Peter during this most uncertain and difficult time in their lives.  (A-1). No further punishment is necessary to impress upon Kevyn the seriousness of the offense.

Ms. Rakowski respectfully seeks the Court's lenience in determining a sentence that the Court finds to be appropriate.

NATURE AND CIRCUMSTANCES OF THE OFFENSE:

Respectfully, Ms. Rakowski requests that the Court also consider the nature and circumstances of the subject offense. Ms. Rakowski humbly assures the Court that she has no intention of re-litigating the verdict at sentencing.  In this context, wherein Congress directs the

Court to consider the nature and circumstances of the offense, as the Court broadens its gaze past "guilt" to "blameworthiness", Ms. Rakowski respectfully requests that the Court consider that she was a relatively passive participant in the activities that gave rise to the conviction.

Although Ms. Rakowski was Controller in title, she only began her employment with the Bank in April of 2006, after the Bank's loan growth strategy had been under way.  By the time Ms. Rakowski joined the Bank, the waiver practice had existed for at least 16 years.  Notably, prior to joining the Bank, Ms. Rakowski had never held a position with a financial institution.

Ms. Rakowski relied on individuals who had been in the Finance group at the Bank, and trusted in the long existing process during her first three years as an employee.  The Finance group used the information given to them from credit employees to create the past due nonperforming reports. Ms. Rakowski did not have anything to do with deciding which loans to waive and not waive.

The trial testimony indicated that Ms. Rakowski delegated the preparation of the past due report to Mitch Slijepcevic (former Assistant Controller) and his staff.  With respect to the Bank's reporting obligations, Mr. Slijepcevic testified that he was responsible for the same duties as Ms. Rakowski (3791:9-12) and that he was in charge of financial reporting (a section Ms. Rakowski supervised) (3792:5-7).  The organizational chart as of June 2010 (DX 2793) confirms Mr. Slijepcevic was in charge of financial reporting during the conspiracy period. 3791:19-3792:2. Mr. Slijepcevic indicated that the numbers for the financial reporting would come from different sections or divisions of the bank.  3794:10-25.  The reports would depend on the accuracy of these numbers coming from different sections or divisions of the bank, and Mr. Slijepcevic did not verify the numbers but assumed that people acted in good faith in reporting to him truthfully and accurately. 3794:10-3795:15. Neither Mr. Slijepcevic, nor Ms. Rakowski had

responsibility for lending, underwriting, and verifying the creditworthiness of the borrower. 3793:7-17.

Mr. Slijepcevic testified that Kevyn was learning about the banking industry and the function of the bank as part of her responsibilities throughout 2006 to 2010.  3782:3-10.  Most of the time Mr. Slijepcevic and Kevyn saw eye-to-eye on accounting issues.  3782:20-24.  If they disagreed in accounting issues Mr. Slijepcevic and Kevyn, as well as others in the controllers group, would engage in healthy debate about the issues.  3782:25-3783:13. Mr. Slijepcevic never felt undue pressure from Kevyn to make a different accounting decision than the one he wanted to make. 3783:18-21.  Mr. Slijepcevic also testified that Kevyn Rakowski never asked him to lie to the Federal Reserve and its examiners, any other regulatory agency. 3783:25- 3984:9. Kevyn never asked Mitch to withhold any information from the Federal Reserve in the course of reporting or in the examination by the examiners. 3784:10-17. Kevyn never told Mitch to lie to the SEC or to conceal anything from them. 3784:18-21.  Kevyn never asked Mitch to lie to KPMG or to withhold any information from KPMG. 3785:7-15.

Moreover, Kevyn's role as Controller was subordinate to David Gibson's as Chief Financial Officer and Executive Vice President, to whom Kevyn directly reported.  Robert Harra, the Bank's President and Chief Operating Officer was also senior to Kevyn.  William North like Kevyn was a Senior Vice President, however he was the Bank's Chief Credit Officer.  Each of the co-defendants' tenure at the Bank was significantly longer than Kevyn's.

The former co-defendant Wilmington Trust Corporation agreed to pay a civil forfeiture in return for the dismissal of criminal charges against the bank.  Ms. Rakowski is a named defendant in the related SEC Action, which is currently stayed.

In addition, other than her salary and benefits, Kevyn did not personally gain from the alleged offense conduct. This case is distinguishable from those cases where a defendant has misappropriated money for their own purposes, created a false identity, or made fraudulent transactions. Kevyn has lived an honorable and law abiding life until the instant offense began in her life in her mid-50s. As set forth herein, she has been a devoted wife, mother and caretaker, and a giving member of her community. Respectfully, the Court should grant a variance based on the fact that the alleged conduct was isolated in the context of her entire life. See, e.g., United States v. Howe, 543 F.3d 128, 132 (3d Cir. 2008) (variance granted based on an "isolated mistake" in an otherwise long and entirely upstanding life).

### ii) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [§ 3553(a)(2)(A)];

Concerning the question of general deterrence, this prosecution has already sent shockwaves through the banking community. The defense submits that to a banker or licensed professional, the prospect of suffering what Ms. Rakowski has suffered is terrifying: a federal prosecution, a federal conviction, the attendant publicity, the threatened loss of a license, unemployability, and the destruction of one's reputation, not to mention the toll on one's physical and emotional health. No one would view with sanguinity the imposition of *any* sentence. Imposing sentence of probation, with or without conditions, properly reflects Ms. Rakowski's culpability in light of all of the purposes of sentencing, including general deterrence.

### iii) The need for the sentence imposed to afford adequate deterrence to criminal conduct [§ 3553(a)(2)(B)];

Recent studies have shown that there is no difference between probation and imprisonment in deterrent effect. *See e.g. Nat'l Research Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences* 134-40, 337 (2014) (concluding that

18

because the marginal deterrent effect of long sentences, if any, is so small and so far outweighed by the increased costs of incarceration, long sentences are "not an effective deterrent"); Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence* (2013);  Frances T. Cullen et al. *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, Prison Journal 91: 48S (2011).

Other studies have found that, while specific and general deterrence are components of most sentences, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447- 48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

### iv) The need for the sentence imposed to protect the public from further crimes of the defendant [§ 3553(a)(2)(C)]; and

At 65 years old, having only been involved in the instant non-violent offenses in her entire life, there is certainly no need to impose a sentence of confinement to protect the public from future crimes of Ms. Rakowski.  Again, she is no risk of becoming involved in this type of criminal activity in the future.

It must be noted that the offense conduct occurred almost 10 years ago. Needless to say, Ms. Rakowski has not committed any wrongdoing during this time.  Her record of good behavior militates in favor of a probation sentencing. Sentencing Ms. Rakowski to a period of custody would be counter-productive to accomplish the goals of sentencing.

Ms. Rakowski has zero criminal history points. Courts have found that "the length of time a person refrains from the commission of crimes, which is invariably tied to a person's age, is a factor that is critical to a court's determination of the sentence it should impose." United States v. Ward, 814 F.Supp. 23, 24 (E.D. Va. 1993) (the 49 year-old defendant justifiably received a guidelines downward departure after the sentencing court determined that he had led a life otherwise void of criminal convictions). "The positive correlation between age and recidivism is impossible to deny[,]" and it has been observed that "[r]ecidivism rates decline consistently as age increases." United States v. Nellum, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) quoting Federal Sentencing Guidelines, at 121; see also United States v. Green, 2007 WL 869725, at *2 (S.D. Ohio Mar. 20, 2007) ("[D]istrict courts have routinely considered a defendant's age as part of their analysis on the ground that older defendants exhibit markedly lower rates of recidivism compared to younger defendants.").

Statistically, a 65 year-old, first time offender, in criminal history category 1, such as Ms. Rakowski, has only a 6.2% likelihood of recidivism. *See U.S.S.G., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28. Realistically, however, the true likelihood of recidivism here is 0%. Ms. Rakowski is no longer employed and she is retired from accounting. There is no chance that Ms. Rakowski would ever even be in a position to be involved in conduct similar to that presented in this case. Given Ms. Rakowski's age, the statistics, the circumstances and other mitigating factors in Ms. Rakowski life, there is zero chance that she would commit an offense in the future. For this reason, among others, the Court should sentence Ms. Rakowski to the minimum sentence as required by law.

**v)   The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [§ 3553(a)(2)(D)];**

Ms. Rakowski is not in need of any educational or vocational training, nor of any correctional treatment. She does require frequent medical care and treatment, which would be best served with a sentence of probation.

**vi)   The kinds of sentences available [§ 3553(a)(3)];**

By referencing the Guidelines range, the Court can sentence Ms. Rakowski anywhere from probation, home confinement, or confinement of up to 108 months in prison.

**vii)   The kinds of sentence and the sentencing range established in the Federal Sentencing Guidelines [§ 3553(a)(4)(A-B)];**

Ms. Rakowski has a total offense level of 29 and a Criminal History Category I, which results in an advisory Guidelines sentencing range of 87 - 108 months. The Court can sentence Ms. Rakowski anywhere from probation to 108 months.

**viii)   The need to avoid unwarranted sentence disparity [§ 3553(a)(6)]**

In seeking to avoid unwarranted sentencing disparities. This Court can and should consider the sentences imposed in similar cases generally, and in the directly related cases.

Thus far in fiscal year 2018, sentences below the Guidelines range were imposed in 56.9% of all fraud cases. *See* U.S. Sent'g Comm'n, *Preliminary Quarterly Data Report, 3rd Quarter Release, Preliminary Fiscal Year 2018 Data (October 1, 2017 through June 30, 2018)*, Tbl. 10A. Downward variances were granted in 35.8% of all fraud cases. *Id.* For all fraud cases during this same time frame, the mean sentence was 27 months, and the median sentence was 17 months. *Id.*, at Tbl. 6. For all fraud cases during this same time frame, 12.2% of offenders received probation only. *Id.*, at Tbl. 7. During this time frame, Third Circuit courts granted

21

variances in 31.8% of the total number of matters under the Guidelines; Delaware specifically granted variances in 45.5% of the total number of matters.  *Id.*, at Tbl. 9A.

Here, the defendants in the related cases are awaiting sentencing. Your Honor will be sentencing the co-defendants in this matter on December 17, 2018 and December 19, 2018.  The former co-defendant Wilmington Trust Corporation agreed to pay a civil forfeiture in return for the dismissal of criminal charges against the bank.  Comparatively, Ms. Rakowski's conduct was not as egregious as other defendants. Sentencing Ms. Rakowski less severely than the other defendants, and in proportion to her conduct, would not cause any unwarranted sentencing disparity.

### ix) **The need to provide restitution to any victims [§ 3553(a)(7)].**

In accordance with the PSR, the probation officer will determine if restitution remains outstanding, and if Ms. Rakowski has the ability to pay a fine in this case.

## II.   **LETTERS**

Ms. Rakowski will be prepared to address Your Honor at sentencing.  Additionally, in support of Ms. Rakowski, attached are letters addressed to Your Honor:

|      |                  |
|------|------------------|
| A-1  | Kevyn Rakowski   |
| A-2  | Peter Rakowski   |
| A-3  | Kim ██████       |
| A-4  | Jennifer ███████ |
| A-5  | Peter Kilpatrick |
| A-6  | Tim Kilpatrick   |
| A-7  | Donna Rakowski   |
| A-8  | Gail Howard      |
| A-9  | Denise McQuillen |
| A-10 | Bruce Sickel     |

## III.   JUDGMENT OF CONVICTION REQUESTS

The Bureau of Prisons must consider any judicial recommendation when designating a defendant's place of imprisonment.  See Bureau of Prisons Program Statement 5100.07; see also 18 U.S.C. § 3621(a)(4)(B) (the BOP must consider "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence— (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28").

Recognizing that the Court does have the discretion to impose a sentence of incarceration and in the event that the Court decides to impose a sentence of imprisonment, Ms. Rakowski respectfully requests that this Court make a written recommendation in the Judgment of Conviction as follows:

> "The Court recommends to the Bureau of Prisons that Defendant Kevyn Rakowski be placed at a location best facilitating family visitation and capable of accommodating her medical conditions."

In addition, when incarcerated, Ms. Rakowski may be eligible for community confinement at the end of sentence.  Thus, while recognizing that a court's recommendation is not binding, Ms. Rakowski respectfully requests that this Court make a written recommendation in the Judgment of Conviction as follows:

> "The Court recommends to the Bureau of Prisons that Defendant Kevyn Rakowski be placed in community confinement for up to the last twelve months of her sentence or as long as federal law permits."

See Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 251 (3d Cir. 2005) ("the BOP should consider the sentencing judge's recommendation and the other § 3621 factors the BOP routinely considers").

Ms. Rakowski would receive a more favorable designation by the Bureau of Prisons if she is permitted to self-surrender.  We respectfully request that the Court permit her to do so.

## CONCLUSION

For the reasons explained above, we submit that a sentence of probation is appropriate. On behalf of Defendant Kevyn Rakowski, we respectfully request the Court impose a sentence of no more than probation.

Respectfully submitted,

/s/ Henry E. Klingeman
Henry E. Klingeman
Helen A. Nau
KROVATIN KLINGEMAN LLC
60 Park Place, Suite 1100
Newark, NJ 07102
Telephone: (973) 424-9777

Bartholomew J. Dalton (#808)
Ipek K. Medford (#4110)
Andrew C. Dalton (#5878)
DALTON & ASSOCIATES P.A.
Cool Spring Meeting House
1106 West Tenth Street
Wilmington, DE 19806
Telephone: (302) 652-2050

*Attorneys for Defendant*
*Kevyn Rakowski*

Dated: November 19, 2018

## Kevyn Rakowski Sentencing Letters

| Ex. | Name | Relationship |
|-----|------|--------------|
| A1 | Kevyn Rakowski | Defendant |
| A2 | Peter Rakowski | Husband |
| A3 | Kim ▮▮▮▮ | Daughter |
| A4 | Jennifer▮▮▮▮ | Daughter |
| A5 | Peter Kilpatrick | Brother |
| A6 | Tim Kilpatrick | Brother |
| A7 | Donna Rakowski | Sister-in-law |
| A8 | Gail Howard | Friend |
| A9 | Denise McQuillen | Friend |
| A10 | Bruce Sickel | Friend |

# EXHIBIT A

1

November 2, 2018

Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555


United States v. Gibson, et al.
Crim. No. 1:15-cr-00023 (RGA)

Dear Judge Andrews,

I write this letter to tell you of myself and my family and to respectfully request leniency in the matter noted above.

I was raised in a household, along with my three brothers, where honor and integrity were valued above all else.  My father graduated West Point with honors and was a B52 pilot during World War II.  He received numerous medals during the war, including a Bronze Star for heroic service in connection with operations against an opposing armed force and a Distinguished Flying Cross for heroism or extraordinary achievement while participating in an aerial flight. While he was considered a hero by others, my father merely felt that he did his duty and what was right.  He very seldom spoke of his actions during the war, but he continually spoke to his children of how important it was to be honest and to do the right thing.  My siblings and I have strived to do this all our lives and I believe we have accomplished that.

I married a man much like my father in that he also believed in these values above all else.  I married Peter Rakowski when I was 19 years old.  I never lived on my own, but went from my parents' house directly to living with my husband.  We raised two daughters and taught them that the worst thing you can do is lie and not take responsibility for your actions.  We raised them in the Episcopal church, which teaches the same values, where we were all active.  While my daughters were acolytes and very involved in the youth group, my husband Peter was a Treasurer and Junior Warden.  I was part of the Altar Guild and the choir and we supported the Church and youth group financially and with our time.

My time when my children were younger was spent with them and our church.  When they were in grade school, my youngest was nine years old, I returned to school for my degree so I could help provide my daughters with better education to help them succeed in their lives. When I graduated with honors from Tulsa University, I immediately went to work for Arthur Andersen.  I was 38 years old at the time and the oldest person that office had ever hired,

which spoke to the Managing Partner's, Jim Miller, confidence in me which I value to this day. While I continued to be there for my daughters and my church, I also supported my University financially and with my time at events and I became involved with United Way. My husband and I continued our support to United Way throughout our working careers. We have also supported several churches throughout the various places we have lived. We currently support our church financially as well as through specific events such as Day of Hope, which prepares disadvantaged children for their first day of school and through the Salvation Army bellringers. We also support the American Red Cross through disaster relief funds and help support the local food bank here in Florida.

While my husband and I have always felt it important to contribute to society through our work and financially, family has always come first. We helped support my oldest brother financially for many years and had him live with us for two years when he was unable to work. My mother-in-law lived with us for four years and was at home as she requested during the final stages of her illness. When my husband's kidney disease progressed, I donated one of my kidneys to him when his brother was not able to do so. While my daughters are capable, hard working women with responsible husbands, we have recognized how much more difficult the world is now versus when my husband and I were their age. Thus, we have helped them financially when we can, such as down payments for their houses.

The last five years have been very difficult for my family and myself, especially the last three since the indictment and the trial. While I worry about myself and recent health problems, I am most concerned for them. My oldest daughter, Jennifer, has been angry and bitter for some time now and this is so unusual for her. She has always been my happy-go-lucky child who takes the world with an easy-going nature, but this has not been evident in the last year. ████ ███████████████████████████ after my husband died. My youngest daughter, Kimberly, lives in ████████ with her husband and ████████████████████████████████ ██████████████████████. She communicates with me every day as she is fearful of not being able to contact me living so far away. I cannot imagine what my going to prison will do to both of them, especially since the loss of their father.

My husband, Peter died on September 7th of this year. He had numerous health problems and the stress of the last several years only aggravated many of his conditions. He survived a kidney transplant 17 years ago and the problems with adjusting to that and the medications. He had a minor stroke in April 2015 after the news that an indictment against me was most likely. He had a heart condition diagnosed in January 2013 and we were told his heart function had decreased to less than 40%. He worked hard for five years to increase his heart function to 56% as of last Fall. As of June of this year, his heart function had decreased again to 44% and his doctors believe the most likely reason was the stress of the trial and the verdict. The doctors could not tell me why he passed out and fell, but I know that stress has been a factor in all of our lives for several years. He was a good, kind, caring husband and father. He was my best friend for 47 years for which we were married for 45 and my daughters and I have been

devastated by his death.  Losing his support now when I face a prison sentence seems unimaginable for me and my daughters.

I would like to also tell your Honor that I am sorry for all that occurred at Wilmington Trust. Maybe I was naïve in believing what I was told by the people around me.  No one wanted the Bank to be sold or for employees or investors to be hurt.  I made every effort to help the people who worked for me find other positions, as many at the Bank did also.

As I noted above, I would request that your Honor be as lenient as possible in my sentencing. Mostly for my daughters as they have faced this hardship for many years now and it has affected them greatly.  I ask that they not have to go without their mother so soon after losing their father permanently.

Respectfully,

Kevyn N. Rakowski

2

Honorable Richard G. Andrews                                       August 20, 2018
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

<u>United States V. Gibson, et al.</u>
Crim. No. 1:15-cr-00023 (RGA)

Dear Judge Andrews,

My name is Peter A. Rakowski, Kevyn's loving husband for over 45 years and who has known her for over 47 years. Ironically, as I write this letter today, Kevyn and I first met 47 years ago to the week in 1971, during a Business Law class we were taking together at then Howard County Community College, in Big Spring Texas. I write you today to request your leniency in Kevyn's sentencing because no one knows of Kevyn's honesty, integrity, character, mercy and compassion towards others better than me. Only GOD knows her soul better than me.

Throughout Kevyn's more than 65 years of life, she and our immediate and extended family members, have all been redirected and guided by four important underpinnings: our faith in GOD, our love and duty to our country, our support and guidance to our families, and commitments made in the workplace. I hope the following will help you better understand that Kevyn's integrity, honesty and character has never been questioned prior, during and after the recent Court proceedings. It is not in her DNA and life's work to ever willingly and/or intentionally commit a criminal act.

Kevyn attended various churches growing up on various military bases and I was raised as a Roman Catholic. We were married March 22, 1973 in what was the Williams Air Force Base Catholic chapel, in Chandler, Arizona, while I was still serving the US Air Force. Later in our marriage, and after our two daughters were born, Kevyn, Jennifer and Kimberly were baptized and confirmed in St. Luke's Episcopal Church, in Bartlesville, OK. I converted to Episcopalian and was also confirmed in this church. During our time at St. Luke's, Kevyn was active in the choir, Altar Guild, religious classes and assisited in the youth programs, in addition to providing financial support. I served as the church Treasurer and Junior Warden, a member of the vestry. During Kevyn's time at St. Luke's she also participated in helping our church to accommodate a Russian family of four, escaping Russia because of religious persecution. This was truly a remarkable experience for our entire family. Kevyn not only attended church activities but incorporated her religious beliefs into our family and work life. In addition to following the Golden Rule, she and our family, firmly also believed in following basic axioms, do the right thing no matter what the cost and have mercy/compassion when helping others in trouble or need.

When my younger brother retired early, he and his wife sold their Florida home and all their belongings and moved to Chiang Mai, Thailand to serve as church missionaries. During this period, they became ordained ministers. Kevyn and I gladly provided monthly financial support for their outreach activities from 2005 until they returned to Florida in 2012.

Kevyn grew up in a military family, led by her father, William J. Kilpatrick Jr. ("KP"), the son of a former State Senator in Iowa. KP was a Class of '43 West Point Cadet and this Class was graduated early so the cadets could enter World War II. This Class sustained the highest level of fatalities in WWII and if you were to go to West Point you will see the main gate is dedicated to these Class of '43 cadets. While in West Point, KP was honoured and selected by the cadets to serve as the Honour Code Leader. This position monitored and enforced the West Point's infamous Honour Code. After graduation, KP became a bomber pilot and earned many flying accommodations, to include the Distinguished Flying Cross and the Bronze Star. During the war, he was shot down over Europe, captured and endured physical hardships that lingered on until he died in 1998. KP was eventually freed as part of a prisoner exchange. His remains are in the West Point cemetery with many of his Class of '43 cadets.

During KP's life after the war, his wife, three boys and Kevyn lived the military life. Love and service to our country was expected. Kevyn was subject to "military like" discipline and her honesty, integrity, and character-building traits were developed. She has valued and exemplified these values her entire life. As part of being part of a military family, her father was frequently deployed to many Air Force and NATO installations and such moves were difficult on the family. For instance, because of these frequent assignments, Kevyn ended up attending three high schools—a daunting task for a young teenage lady. During her military family years, she learned first-hand the cost of "doing the right thing no matter what the cost". KP was on track to become a General but was passed over because he refused to blame others under his command for a problem. KP stepped forward and took the blame. This was a significant life lesson to Kevyn.

Like Kevyn, I too grew up in a military family. My father was one of six brothers and sisters first generation Polish immigrants to serve in World War II. My father also made a career in the US Army Air Corp./ US Air Force and retired as a Master Sargent. I also learned to love and honour our country and was also subject to "military like" discipline and subject to honesty and integrity, and character-building expectations. I joined the US Air Force during the Vietnam era and was eventually stationed at Webb AFB in Big Spring, Texas, where Kevyn and I first met.

While Kevyn and I were dating I met her best friend, Linda Gayle Smith, and learned her father was a MIA pilot lost in Vietnam. Kevyn's friendship, compassion and mercy towards Linda was a remarkable thing to witness. This was one of the many reasons I was attracted towards Kevyn.

Our faith in GOD and our military family inspired honesty, integrity, character building and discipline background served Kevyn and I well into our family life. Our original plans were for me to finish up my undergraduate degree in accounting, assisted by the the GI Bill and Kevyn's work as a dental assistant, obtain a position with a Big 8 accounting firm and start our family. I was to be the primary source of financial support while Kevyn would care for our daughters and become active as a volunteer in the community. This plan was the identical to what both our parents had successfully adopted. After several years in public accounting I left for a tax position with a public firm in Philadelphia. While working fulltime, studying for the CPA exam and earning a MS in Taxation at Drexel University, Kevyn had to care for everything at home. After completing my MS program, in 1981, I accepted a new tax position with Phillips Petroleum Company in Bartlesville, OK.

In 1983 Kevyn's parents moved from Phoenix to northeast Arkansas to be closer to KP's brother and our family. During this time, KP had a significant surgery for an old WWII incurred health issue. After his surgery, Kevyn welcomed him into our home and helped her mother care for her father until he

properly healed. She did all of this while maintaining our household and caring for our daughters. Tragically in October,1984 Kevyn learned from her father that her mother had died in an auto accident. After the funeral her father came to live with us for many months until he could recover from the shock and decide on his future. Kevyn was there to provide emotional support for her father, while she also grieved with the loss of her mother. This is another example of the mercy and compassion that so many people admire in Kevyn.

Our original plans for my providing the family financial resources was working as planned until in 1986. In that year I learned I had an uncurable polycystic kidney condition. As a result, my work career was in jeopardy and this medical condition precluded my purchase of additional disability or life insurance. Faced this dilemma, Kevyn decided to go back to school while she continued to care for our daughters and assist in our local schools and community. Her goal was to be able to support our family if needed.

We lived at least 60 miles from Tulsa, OK, the nearest locale of a 4-year college or university. Kevyn commuted to and eventually graduated from Tulsa University, Magna cum Laude with a BS degree in accounting. Even though Kevyn was a "Non-Traditional" student (a PC term for older student) she was hired and started her career with Arthur Andresen.

Just like she excelled in school, Kevyn also did so in her work.  She quickly became an OK CPA. Kevyn was on the Partner track in Tulsa until we moved back to my home town area of south New Jersey, so I could join my brother's software consulting firm and be closer to higher quality kidney transplant hospitals. In 1998, Kevyn transferred to the Philadelphia office of Arthur Andersen but it was not a good match. Because we left Tulsa, her professional career suffered for my benefit.

During our family life in New Jersey, Kevyn's extraordinary character, mercy and compassion was again exhibited by her actions. On September 5, 2001 Kevyn and I entered Jefferson Hospital where she donated one of her kidneys to me. While I recovered and sought new work over the next 13 months, Kevyn provided our sole financial support for our household and covered the costs for our two daughters in college. In 2004, a year after I began work as an IRS Agent in Edison, NJ, my brother and sister-in-law moved to Florida and my widowed and lung cancer survivor mother came to live in our home. Kevyn once again lovingly accepted and compassionately assisted my mother.  In 2005, Kevyn welcomed her older chronically unemployed and ███████████████ brother, from San Diego to New Jersey to live with us. Kevyn had more than enough on "her plate" with working, maintaining our household and helping my mother, to now support her financially and emotionally broken brother while he looked for work. Once again, Kevyn valued the welfare of others before her self-interest.

In 2005, my mother's cancer returned. Up until the night she died, Kevyn helped me to keep my promise to my mother, that she would not die alone in a hospital. In 2010, Kevyn was also there for me when my physically handicapped and widowed younger sister, who had already endured 13 major operations, suddenly died of a brain aneurism. She was awaiting a liver/kidney transplant for the same polycystic condition I have.

Throughout our daughter's formative and yearly adult years, Kevyn made sure her faith and family values were taught and lived before them. Kevyn was always there to discipline when needed but also to always supply love and nurturing. A couple of years ago, our youngest daughter told her she did not understand at the time why we she was insistent on discipline and holding her responsible for even minor infractions. She then commented that she has grown to realize this importance---and thanked

her. Because of Kevyn's hard work and generosity, we were able provide for both daughter's college, wedding and home start-up expenses---a true rarity in the early 2000's. We are truly blessed that both of our daughters are independent, tax paying, law abiding and happily married citizens. Our oldest daughter, Jennifer, has willingly served on two juries in the Philadelphia court system. In the last case, she served as the jury foreperson in a capital murder case. You can appreciate the dedication that Jennifer must have had to serve in such a role. Anyone who knows our daughters can see examples of the values of honesty, integrity, compassion and mercy they learned at home, especially from Kevyn.

Kevyn's lengthy legal ordeal has already taken its toll on our daughters, both emotionally and physically. Our youngest daughter is married to a fine gentleman from ███████████████████. Kevyn's Passport had to be surrendered at the time of her indictment. A couple of years after the indictment, the Court denied her request to visit them, even after offering to post any bond, etc. My daughter has only seen Kevyn a couple times during this ordeal.███████████████████ ███████████████████████████████████. Our oldest daughter's temperament has also drastically changed because of Kevyn's legal woes and altered her life outlook. I fear how a sentence that takes Kevyn away from our daughters will impact their physical and mental well-being.

Kevyn has always been successful because of her extreme work ethic, devotion to assigned tasks and obligations to her employers to provide value.

After leaving Arthur Andersen, she worked for two other quality and ethical companies before joining Wilmington Trust ("WT") in April,2006. WT valued her past management experience, saw her ability to learn a new industry, and learn/work with others.  Most executives and employees had worked and gained banking at WT many more years than her. Kevyn was the Controller with up to six direct reports and a total staff of 75. Kevyn was hired without having any prior banking accounting and regulatory experience—she had to deal with an acute learning curve.  During this start-up period and even afterwards, she relied heavily upon her direct reporting managers, in-house SEC attorney, credit professionals and KPMG for assistance. She also attended several banking specific management training classes.  By the time Kevyn joined WT in 2006 and gotten up to speed with the banking accounting/regulatory requirements, many of the loans that were in question in during the trial had already originated. During WT sponsored social, charitable and business gathers I attend with Kevyn, I was frequently told by upper management, colleagues, her managers and staff members and KPMG personnel of the great work she performed and their enjoyment working with her in WT. Her honesty, integrity, character, mercy and compassion traits learned and cultivated during life served must have been evident in the workplace.

As I am over 69 years old I have experienced many medical challenges. I have had high blood pressure since the 1980's, received a kidney transplant, from Kevyn, in 2001 (with a 15-20year shelf life), had a heart defibrillator installed and later a heart oblation in 2013, dealt with skin cancer issues since 2003 arising from my kidney rejection medications and since 2016 suffered the virtual loss of sight in my left eye arising from a macula defect. While I can deal with these issues God has put before me, I know Kevyn is very concerned of how any time away from me will have a harmful impact on my medical prognosis. Her worries about me only heightens my levels of anxiety---which is not healthy.

Kevyn, now over 65 years old, has her share of medical issues. She suffers from inherited family medical issues of high blood pressure, insomnia and back ailments dating back to shortly after we were married. Kevyn also suffers from worsening periodontal problems, TMJ in new left jaw (a jaw socket defect), left

shoulder, elbow and wrist problems and increasing gastrointestinal problems (probably related to her constant stress levels). I am seriously concerned for her health and mental welfare if she was taken away from the excellent care she is currently receiving here in southwest Florida. Both Kevyn and I come also from families with aging medical challenges and not of long life expectancies.

Back in October,2017 Kevyn received a reasonable plea offer from the Government attorney which have prevented her from being included in this Case. This plea was offered at the time the Government concluded a settlement with WT, which removed the same criminal charges directed at Kevyn, in return for a monetary payment. Kevyn would have to admit guilt to only one of the many charges, incur no monetary payment and most importantly, the Government's recommendation for probation. However, to accept this plea Kevyn would have to go before your Court and under oath LIE that she was a guilty person. Lying under oath to you and God to gain her freedom was against everything Kevyn believed in, exhibited in her life and taught her children. Unlike Mr. Terranova, the Government's key witness with a plea agreement, who admitted under oath in your court, that he had lied to the Government attorneys, the FBI and to the jury to "save his ass" and avoid possible prison time, Kevyn "did the right thing no matter the cost". She was unwilling to lie gain her freedom. Kevyn's choice to deny the plea offer was the correct one and me, my daughters and other family and friends fully supported her decision. We have and will always support Kevyn.

Judge Andrews, thank you again for reading my lengthy letter and taking the time to learn about the person I married over 45 years ago.  Her honest, integrity, and character traits she learned and lived by during her over 65 years have never been disputed. Kevyn has never been in any legal trouble before this trial. Her existing and age-related medical issues are increasing. Her daughters and I need her close presence. Finally, Kevyn's freedom would not pose a future threat to society, especially relating to financial matters.

My family and friends will continue to pray that God will guide the hearts and minds of the Government attorney's and you, Judge Andrews, to have mercy, compassion and leniency during sentencing.

Respectively,

Peter A Rakowski

3







4



5

ILLINOIS INSTITUTE OF TECHNOLOGY

**Peter K. Kilpatrick**
Provost and Senior VP
for Academic Affairs

July 30, 2018

Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

Re: United Sates v. Gibson, et al.
    Crim. No. 1:15-cr-00023 (RGA)

Dear Judge Andrews,

My name is Peter Kilpatrick, and I am the younger brother of Ms. Kevyn Rakowski, one of the defendants in the above cited criminal case, United States v. Gibson, et al.. I write today to offer my thoughts about my sister's character, and about the outcome of the recently concluded trial with regards to her case. My sister and I have been close our entire lives. For example, I was born close to Easter of 1956 and my sister (a not quite 3 year old) lobbied our parents to name me Peter Cottontail Kilpatrick, to which my parents had the good sense to ignore and named me instead Peter Kelley. While my sister and I had our share of sibling squabbles, we have always had great affection and love for each other. I feel I know her as well as a brother could.

For what it is worth, I am currently the Dean of Engineering at the University of Notre Dame, an outstanding University. In August, I will assume a new position as the Provost and Senior Vice President for Academic Affairs at the Illinois Institute of Technology. I am also a Chemical Engineering Professor and have been one for the last 35 years.

Our parents, the late William J. Kilpatrick, Jr. and P. Patricia Kilpatrick, were sticklers for excellence. So Kevyn and I (as well as our brothers) were always driven to excel. My father was especially adamant about virtue, integrity, and accountability (he was the President of the West Point Honor Council his last year at the USMA in 1943). I characterize my father's attitude on this point as "if something bad happens to you, take accountability for it!" I think it is fair to say that Kevyn and I really took this to heart. I strive to never blame anyone else for anything. I also strive to take responsibility and to be sincere and authentic. Kevyn does as well. Dad spoke loudly through his actions, not so much with words. His character led to him being passed over for a promotion to General because he refused to solely blame someone under his command, but took responsibility for the issue himself as the commander in charge. I (and all my siblings) have strived to be as honest and accountable as our father all of our lives.

*Judge Andrews*
*Page Two*

My sister is also a kind and caring person. An example is that she took in our older brother when he had financial problems and lost his job. Our brother lived with her for 23 months while he struggled to find work. I know this was a hardship for my sister and a strain on her marriage; her mother-in-law was also living with them through that time period. While it was important to me and my siblings to support our older brother, it was my sister who stepped up and took our brother in.

I must say I am shocked and dismayed by the verdict of the jury in this case. I know that throughout the last several years, the charges levied against Kevyn and the impending trial have weighed very heavily on her. When the verdict was reached in early May, Kevyn was unable to talk with us she was so distraught. But as I write above, I know Kevyn has always valued sincerity, authenticity, honesty, integrity, and accountability above all. I would simply ask you, Your Honor, to be as lenient as the law might allow. I do not believe my sister in any way to be dishonest or fraudulent.

No matter what happens at sentencing, I stand by my sister, whom I know to be a loving, caring person of the highest integrity. I also know that she could never violate her conscience. I respect, admire, and love my sister. I do know that a prison sentence might well damage her health and the health of her husband Peter Rakowski, who I am sure, has suffered as much as my sister throughout the preceding years. So again, I plead with you, Your Honor, to be lenient.

I am willing to expand on these brief remarks and would be willing to be present to answer any and all questions about my sister.

Respectfully yours,

Peter Kilpatrick

6

TIMOTHY J. KILPATRICK

██████████████████████

July 22, 2018

Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

Re:   <u>United States v. Gibson, et al</u>
      Crim. No. 1:15-cr-00023 (RGA)

Dear Judge Andrews:

My sister, Kevyn Rakowski, and I are two of four siblings raised by Colonel and Mrs.
William J. Kilpatrick, Jr. Our father served in the Unites States Air Force and as a
military family we were raised in several different States. As such, our mother and father
expected their children to act in a respectful, dignified, disciplined fashion. My father
truly believed part of the USAF motto, "integrity first." He and my mother expected
their children to act in morally correct and respectful fashion to everybody around them.
My sister, Kevyn, has always represented those qualities in her dealings with me and to
the people around her. The upbringing which Kevyn and I and our siblings had fully
prepared us for the challenges and the commitments of adult life.

Kevyn has always shown herself to be a caring spouse and mother. Throughout her
marriage to Peter Rakowski she has supported him completely. Peter Rakowski has
encountered numerous health issues in his adult life and Kevyn, in her great love for her
husband, donated one of her kidneys to her husband to save his life. I don't believe a
person can be a better, more caring spouse than that. After my brother, Bill Kilpatrick,
suffered a heart attack and lost his job my sister Kevyn opened her home to him for
several years helping him get back on his feet. Kevyn and her husband, Peter, are long
time congregants of the Episcopal church and are honest, decent, god-fearing people.

During the course of my adult life, Kevyn has always shown a real sense of honor and
duty in everything that she does. This prosecution of my sister, and the real emotional
and psychological toll it has taken on Kevyn, seems unfathomable to me. I cannot
imagine my sister acting in a way that would be anything other than upstanding and
honest. As always, I continue to believe and trust in my sister and will provide whatever
help I can to her. My sister, Kevyn, has never given me any reason to feel any other way
about her.

Respectfully yours,

Timothy J. Kilpatrick

██████████████████████

7

July 29, 2018


Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 632S
Wilmington, DE 19801-3SSS

Ref:     United States v. Gibson, et al.
         Crim. NO. 1:15-cr-00023 (RGA)

Dear Judge Andrews,

I like to introduce myself to you.  My name is Donna Rakowski and I'm Kevyn's sister-in law.

We first met in i978 when I was dating her husband's brother, Paul.  Kevyn and I became friends from
the start. Her kind and loving personality won me over.  She has always been a devoted Mother to her
two daughters and devoted wife.  As a homemaker, her home was always clean and tidy as she
performed her task each day and kept everything going smoothly.  When her children were older and in
high school, Kevyn returned to school and pursued a Bachelor's Degree in finance and eventually took
the CPA exam.  Her academic achievements were excellent and true to her style and personality working
diligently to give it her best.

Kevyn not only did her best at home and in her scholastic endeavors but her kindness shown outside her
home environment.  She is a generous and giving woman reaching out to others.  When her brother Bill
was out work and eventually needed a place to live, Kevyn and her husband, Peter, took him in and he
stayed with them for a couple of years.  When Kevyn's mother-in-law, Monica, had cancer and need
someone to care for her and a place to live, she moved in with them and they gave her wonderful care.
My husband and I were overseas at the time in the mission field teaching English and life-skills, to young
men and women.   Peter and Kevyn, moving in their generous spirit, were one of our faithful financial
supporters.  Kevyn was involved in giving of her time and tides to her local church and also was a
member of the church choir.  In every way, she is an example of the Proverbs 31: 10-3, the virtues of a
noble woman.  Kevyn, for as long as, I have known her has been a diligent hardworking, loving, kind,
faithful mother, wife, family member, friend, good listener and never a gossiper or busy body  minding
everyone's business.

Kevyn's work ethic is impeccable and she gave her all in every corporation she worked for without
question.  I'm believe past co-workers will address her loyalty and performance in there writings. I
personally watched her come in late in the evenings and work through many weekends. As I have
already stated, she was an exemplary employee.

Your Honor, this whole ordeal has been heart wrenching and unbelievable for all of us as a family and for the people who have known Kevyn for many. It has taken a toll on both her and her husband physically and emotionally, not to mention the stress factor over these last few years. Kevyn and Peter are very conscientious and moral people and would not take a dime (inflation considered a dollar) from anyone or any entity ever. I stand by Kevyn and will do what I can to support her and her immediate family going forward.

I hope your Honor you will take all that I have written, as well as others, on Kevyn's behalf into consideration when passing sentencing. I thank you, your Honor, for taking time to read this letter and I appreciate your mercy and grace extended toward Kevyn Rakowski in this case which is presented before you.

Respectfully yours,

Donna Rakowski

8

Gail Howard

███████████████████████████

Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Unit9, Room 6323
Wilmington, DE 19801-3555

Re: United States v. Gibson, et al.
Crim. No. 1::15-cr-00023 (RGA)

Dear Judge Andrews,

Thank you for the opportunity to write to you on behalf of Kevyn Rakowski. Kevyn is a longtime friend in whom I have complete trust and admiration. She has been an important support to me in a time of great grief to me. I am glad to share a bit of that with you so that you may understand her better.

Kevyn and I worked together at Wilmington Trust for several years. As a part of my job as head of Human Resources I was actively involved in recruiting her to the company. She and I quickly became friends and socialized, along with our spouses, outside of work.

Kevyn was an excellent manager of peOple, demanding good and timely work from members of her team, but also was encouraging and supportive. She collected and groomed women and men of talent. She encouraged the best to stretch their skills and was highly admire by the people who worked for her. She was always straightforward with her opinions, giving her take on their work in a tactful way that encouraged their efforts.

On the personal front, Kevyn and I, along with our husbands, spent many fun evenings together and became close friends. During that time Kevyn was challenged with a number of situations her two girls faced as they launched into careers and marriages. She and I would sometimes talk about the worries she had as a parent for the challenges each of her daughters were facing, but she never wavered in her positive face to them. She was – and is – a devoted, no nonsense mother. Her advice was always loving, supportive and practical to her girls, and eventually to their husbands. She continues to be very close to both of them.

As the Wilmington Trust was bought Kevyn and I, along with all the corporate executives, were let go as the leaders in Buffalo at M&T took over the functions. Kevyn and her husband Peter moved to Florida and my husband and I moved into ███████████ However, we visited back and forth regularly and stayed in touch by telephone and notes back and forth.

Out of the blue my life changed dramatically. I left our apartment as usual on the morning of May 29, 2015. My husband, Richard, and I were expecting friends for supper that Friday night. Instead of my husband meeting me at home as I prepared to entertain, the state police came to tell me he had been killed outright in a traffic accident.

Much of the next week is still a blur to me. I felt devastated and wanted to find some sort of grounding to understand what had happened and what all this meant.

During that time, I reached out to Kevyn. She and her husband were scheduled to come for a visit in a couple of weeks and I realized how important that seemed to me. There was no one else I wanted to come and stay; my brother offered, many friends, my business partner all wanted to help by being with me. Having any of those people around seemed like they would be a burden that I could not could not carry. In contrast, Kevyn and her husband I looked forward to having with me.

Kevyn was kind and had an instinct for what I needed and could handle. She talked with me about Richard when I wanted to talk. She avoided the subject when I needed to. She helped me get many little details organized, like sorting out bank accounts and getting the refrigerator fixed (which broke down in the middle of all this). She was patient, but also encouraged me to get things done that were needed.

I will always be enormously grateful to Kevyn and her husband for their support during the next several months. I had hundreds of people express sympathy and show concern for me, and I appreciated all of them and their kindnesses. However, Kevyn and her husband Peter, had the capacity, the instinct and the compassion that was unique in that dark time.

As I try to dissect what makes Kevyn unique I believe it is three things. First, she is smart and analytical. Her insights will take her to the heart of a matter, so if she raises a point I know it is important and needs to be considered.

Second, her honesty is unwavering. You can count on her telling you what she thinks – with tact if it might be hard to hear. Her staff knew her criticisms came from clear-eyed assessment of what they had done and were capable of. This made her praise to them very meaningful.

And most important to me in those months in 2015, her strength. She has remained honest and selfless in her commitment to her family, to friends and the things that she knows are right through many personal hard times – some harder than what I faced in that unhappy time. She is a woman that showed me how to be strong through trials and move on. She stood by my me and supported me, even while she was faced with this terrible prosecution. I hope that my support of her at this time will count to help her.

Judge Andrews, as you consider your choices, I hope that you will hear from many people about the value Kevyn has provided to others. Her goodness, her loyalty and her intelligence. The length of this proceeding has taken a great toll on her and her health, as well has exacted real health consequences on her husband. I hope that you can view her situation with compassion for a very fine person who has already experienced real suffering.

Thank you for your consideration,

Respectfully,
Gail Howard

9

July 13, 2018

Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

Re: United States v. Gibson, et al.
    Crim. No. 1:15-cr-00023 (RGA)

Dear Judge Andrews,

This letter is being written on behalf of Kevyn Rakowski.  I have known Kevyn for five years.  We met through the women's golf association.  When Kevyn was a new member in 2013, I was paired with her as her "big sister".

I have thought many times over the past five years how fortunate I was to be paired with Kevyn as "sisters".  We may have never met otherwise, and I would have missed the opportunity to develop a wonderful friendship with Kevyn that I truly value.  Golf is a game of honesty, integrity, and self-reporting of penalties and scores.  Kevyn has always demonstrated those qualities on and off the golf course.

She is a gentle, kind person who always treats others with respect.  One afternoon Kevyn came home and found a stranger in her screened lanai attempting to get into her outdoor refrigerator.  When Kevyn asked the woman what she was doing, Kevyn realized there was a problem because the woman was mumbling incoherently, and she appeared dehydrated.  Kevyn offered to take the woman to the hospital, which she refused, but did tell Kevyn where she lived.  Kevyn drove the woman to her home and made sure she was inside safely before leaving.

An exemplary act of Kevyn's selflessness is the donation of one of her kidneys to her husband Peter.  She did this knowing the risks of the surgery, the possible complications, and potential life-long health issues it might create for her.  That is the kind of person she is.

She is always thinking of others before herself.  She has expressed great concern about how the prosecution and trial has affected her husband and daughters.  Her husband has several health problems including a heart condition.  A recent exam revealed his heart function has deteriorated due to the stress caused by this situation.

In closing, I would like to say our country and communities need more people like Kevyn Rakowski.  I believe in her and trust her because of all the good qualities she represents.  I will stand by her and help her in anyway I can.

Respectfully yours,

Denise McQuillen
Denise McQuillen

10

# BRUCE E. SICKEL
## CFA, CPA

August 10, 2018


Honorable Richard G. Andrews
United States District Court Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

RE: <u>United States v. Gibson, et al.</u>
Crim. No.  1:15-cr-00023 (RGA)

Dear Judge Andrews,

I am writing to you on behalf of Kevyn Rakowski who was a defendant in the above case.

I was formerly the Chief Financial Officer at Marlin Business Services ("MLRN") and I hired Kevyn as Controller of the company in 2004.  In her role she was a key direct report to me primarily handling the preparation of all financial reports for the company including SEC filings. Kevyn and I worked together until we both left the company at a similar point in 2006. Although my next position caused me to relocate away from the Delaware Valley, Kevyn and I have stayed in touch.

During the time she worked with me Kevyn was an exceptional professional and demonstrated the highest levels of integrity and work ethic.  She was well respected within the organization both by her superiors and subordinates.  Controller has become one of the most demanding and difficult positions in the finance function given the ever increasing workloads created by constantly changing and complex accounting rules coupled with compressing time deadlines. Kevyn could always be counted on to produce the highest quality, timely and most accurate work possible. To say that I was shocked by the news of this indictment against Kevyn is an understatement.  It was a pleasure to work with Kevyn and I would hire her again today if given the opportunity.

I must admit I have found this letter hard to write.  Not because I did not want to do it. Rather I found it challenging to truly express my feelings and word it appropriately in strong enough support for Kevyn.  We are talking about a solid citizen and human being here.  Someone who donated a kidney to a spouse, is a mother of two productive children, good neighbor, active church member, someone who took in her ill mother-in-law and nursed her for several years through a terminal illness – all while maintaining her demanding career.

This case has been extremely difficult on Kevyn and her family. I can't begin to describe the pain and anguish I detect in her voice each time I speak with her since the case began. The shear length of time the proceedings have taken has been extremely difficult. Her career and reputation have been severely damaged by the publicity given the case. Kevyn's husband Peter has suffered significant health issues since the case began which I suspect are largely attributed to the stress created by this matter. As I understand it, Kevyn had to surrender her passport which has created a difficult separation from one of her children who lives in Europe and cannot travel often due to her career.

As soon as this case was made public I immediately contacted Kevyn and offered to be a character witness and would have gladly testified and delivered this message in person if asked. As a long time banker, I have unique insight into the internal workings of a financial institution and the challenges a modern day Controller faces in an institution the size of Wilmington Trust. Banks assets are abstract promises to repay that are negotiated and documented by numerous others outside of the Finance division. Although a critical officer, the Controller is NOT the ultimate finance decision maker within an organization and must rely on many other officers. The Finance team generally has no direct contact with borrowers and has to rely on systems and downstream third-party information to complete assignments and meet reporting deadlines. It is also much easier to look in the rear view mirror years later and see the effects of the unprecedented 2007-09 economic collapse than it was attempting to account for it in real time.

I ask that you are most lenient in your sentencing. I am certain that our criminal justice dollars can be better spent on other matters.


Respectfully yours,


Bruce E. Sickel